RECEIVED IN CLERK'S OFFICE
U.S.D.C. Atlanta

NOV 06 2009

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ABDI S. AHMED, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. |
| | : | |
| RITZ-CARLTON HOTEL | : | |
| COMPANY, L.L.C. and MARRIOTT | : | |
| INTERNATIONAL, INC. | : | |
| | : | 1 09-MI-0475 |
| Defendants. | : | |

## COMPLAINT

PLAINTIFF ABDI S. AHMED brings this action under The Civil
Rights Act of 1964 (Title VII), sec. 701 et seq., 42 U.S.C. sec. 2000e et seq.,
42 U.S.C. sec. 1981, and the Thirteenth Amendment to the United States
Constitution.

1.

This court has jurisdiction under 28 U.S.C. sec. 1331, 28 U.S.C. sec.
1343(3) and (4), and 42 U.S.C. sec. 2000(e)-(5)f.

2.

Venue lies with this court under 28 U.S.C. sec. 1391.

3.

Plaintiff has satisfied all administrative requirements, and a copy of his right to sue letter is attached hereto as Exhibit A.

4.

Defendants are corporations doing business in Georgia, are capable of being sued, are employers within the meaning of 42 U.S.C. sec. 2000(e)(b), and are engaged in commerce within the meaning of 42 U.S.C. sec. 2000(e)(h).

5.

Defendants may be served at Corporation Service Company, 40 Technology Parkway, Suite 300, Norcross, Georgia 30092.

6.

Plaintiff timely filed a charge of discrimination with the E.E.O.C., a copy of which is attached hereto as Exhibit B.

7.

Plaintiff is a black, naturalized United States citizen, born in Ethiopia, who was subjected to discriminatory treatment by Defendants because of his race, black, his national origin, Ethiopian, and in retaliation for his complaints regarding that discriminatory treatment.

2

8.

Plaintiff was been employed by Defendants for 13 years. He was assigned as a server in The Café at the time of the events giving rise to this Complaint.    During his 13 years with Defendants, Plaintiff regularly received positive evaluations; his reviews showed that he met or exceeded expectations.

9.

The first circumstances leading to Plaintiff's termination began on January 19, 2006. On that date a mystery shopper visited The Café while Plaintiff was on duty.    The mystery shopper's report documented minor customer service issues regarding multiple members of the staff.

10.

On January 31, 2006, Plaintiff was called into the office of his manager Armando Guardiola, to meet with him and with Assistant Human Resources Manager Sandy Bell concerning the mystery shopper's report. Both managers ridiculed and mocked Plaintiff; his dedication was questioned and they accused him of continuously providing bad service.

3

11.

On February 7, 2006 Plaintiff was written up for alleged shortcomings stemming from the visit of the mystery shopper which were not consistent with the mystery shopper's report.

12.

Plaintiff was singled out; the write-up was overly critical of Plaintiff and was also inconsistent with the treatment of Plaintiff's white coworkers mentioned in the same mystery shopper's report.

13.

After receiving a copy of the write-up, Plaintiff sent a letter dated February 9, 2006 to Human Resources Manager, Betty Sims, with a copy to the corporate office detailing his concerns regarding both the January 31 meeting and the February 7 write-up.

14.

The response by Defendants to Plaintiff's February 9 letter was a subsequent conversation with Mr. Guardiola and Ms. Sims followed by a letter dated February 13, 2006. At the meeting, they chastised him for contacting the corporate office. During the meeting and in the follow up letter they claimed that the other employees mentioned in the mystery

shopper's report were disciplined in a manner similar to the treatment meted out to him.

### 15.

However, Plaintiff made inquiries and learned that the white employees had not been disciplined or counseled and that no action was taken against Mr. Guardiola or Ms. Sims by management.

### 16.

The second circumstances leading to Plaintiff's termination began on Sunday November 24, 2007. On that date, while working at The Café, Plaintiff received an order for four alcoholic drinks from two guests (male & female) at 10:50a.m. Plaintiff informed guests that the law required him to wait until 11:00am to serve the alcohol.

### 17.

At 11:00 a.m. the guests re-ordered their drinks and Plaintiff served them. Before the end of the hour the guests had ordered and consumed four more alcoholic drinks from Plaintiff who became concerned about their alcoholic intake and the possibility that they were excessively intoxicated.

18.

Plaintiff looked for Manager Mohamed Lebar to report his concern about the intoxicated guests but could not find him.

19.

Shortly thereafter, when the guests were leaving Plaintiff noticed the male's hand shaking as his signed the check. The female collapsed back into her chair as she tried to stand up to leave.

20.

Plaintiff went to the parking valet to notify him to be aware that the guests had been drinking heavily and told him to be sure the person driving their vehicle was okay to drive. Plaintiff had been trained several times regarding the laws and policies concerning serving alcohol to customers and certified once by CARE, Defendants' provider of such training.

21.

The valet shared Plaintiffs concern and once the guests arrived at his station he denied them their car keys. The guests were very upset and complained to management.

22.

On that same date, November 24, following the guests' complaint, Plaintiff was called into the Mr. Lebar's office and reprimanded. Mr. Lebar was angry, verbally abusive and threatening with Plaintiff. At the height of his tirade against Plaintiff, Mr. Lebar used the "F-word" against him, and said "You are a Muslim, you don't know what a drunk person looks like."

23.

On November 26, 2007, Plaintiff sent a letter to the General Manager of the hotel, John McGavin, about the meeting in Mr. Lebar's office on the 24th.

24.

McGavin soon assigned HR Manager Betty Sims and Manager Armando Guardiola to investigate the situation. As soon as he learned who was assigned to investigate, Plaintiff immediately contacted Mr. McGavin regarding his concerns that Mr. Guardiola and Ms. Sims were involved because they were the managers about whom he had earlier complained concerning their treatment of him following the mystery shopper report.

7

25.

On December 4, 2007, Plaintiff met with Armando Guardiola and Betty Sims to discuss the events of November 24th. The conversation focused on the Plaintiff's handling of the customers with very little attention devoted to the complaint the Plaintiff had made against Mr. Lebar. The managers told Plaintiff that they would speak to witnesses.

26.

On December 5, 2007, Plaintiff again attempted to contact Mr. McGavin by telephone and did contact him by email reiterating his concerns that Mr. Guardiola and Ms. Sims were involved.

27.

Plaintiff received a Disciplinary Action Form on December 6, 2007 from Mr. Guardiola regarding the December 4 meeting. He signed the form, stating in writing thereon his concerns about his treatment by Mr. Lebar and how that treatment violated company policy.

28.

On December 7, 2007 Plaintiff received another Disciplinary Action Form from Mr. Guardiola, this one categorized as serious misconduct and informing Plaintiff that he was suspended. The document stated that the

8

witnesses who were interviewed did not corroborate Plaintiff's claim that he had been verbally abused by Mr. Lebar.

29.

Before Plaintiff signed the form, he noted thereon in writing that he had been threatened with termination by Mr. Guardiola if witnesses did not corroborate his complaint about verbal abuse; that he could not guarantee what other persons did or did not hear; that one of the witnesses had a hearing problem and the other was focused on work when the abuse occurred; and, finally, that he would withdraw the complaint to preserve his employment if the witnesses did not confirm the abuse.

30.

On December 10, 2007 Plaintiff was terminated by Defendants from his 13 year employment with them for allegedly providing false or misleading information, a violation of Rule 5 of the Progressive Disciplinary rules in the Employee Handbook.

31.

Defendants have a peer review process whereby employees can challenge their termination for violation of work rules by appealing the termination to a panel of their peers.  On December 10, 2007 Plaintiff

obtained a Peer Review Request form from Ms. Sims' secretary, Ms. Allison Kendigelen, filled it out, and attempted twice to present the form for Ms. Sims' signature. Ms. Sims would not accept the form thus denying Plaintiff a peer review of his termination.

32.

One instance of disparate treatment of a non-Ethiopian national origin employee involved Café employee Ekaterina Borisova, a Caucasian Balkan. She reported busboy Abdella Ahmed, who is of Ethiopian national origin, for sexual harassment claiming that he inappropriately touched her. Mr. Ahmed was suspended for a week while her report was investigated.

33.

Café employees were interviewed but none could confirm or corroborate Ms. Borisova's story. Subsequently, Mr. Ahmed was allowed to return to work. Although this was an identical situation to that of Plaintiff, to wit, an employee filed a complaint against coworker that could not be confirmed, Ms. Borisova was not terminated or disciplined in any way for providing false or misleading information, a violation of #5 of the Progressive Disciplinary rules in the Employee Handbook.

34

In November, 2007 another instance of disparate treatment of a non-Ethiopian national origin employee involved Lobby bar employee Jaysung Le, a Korean, who accused Ms. Azeb Hebeyhu, who is of Ethiopian national origin, of yelling at her and threatening her. Witnesses did not corroborate the complaint. Although this was an identical situation to that of Plaintiff to wit, an employee filed a complaint against coworker that could not be confirmed Ms. Le was not terminated or disciplined in any way for providing false or misleading information, a violation of #5 of the Progressive Disciplinary rules in the Employee Handbook.

## COUNT ONE

## RACE DISCRIMINATION IN VIOLATION OF TITLE VII

35.

Plaintiff is a black male of Ethiopian national origin who was subjected to disparate treatment because of his race by Defendants.

36.

Plaintiff reallages paragraphs 9 through 15, above, as if set out verbatim herein.

11

37.

The discipline of Plaintiff described in paragraphs 9 through 15, above, by Defendants was because of his race, black because his alleged performance deficiencies were no more severe than and equally trivial as those of his white coworkers who were not disciplined.

38.

By their discipline of Plaintiff because of his race, Defendants willfully violated Title VII.

## COUNT TWO

## RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. sec. 1981, and the THIRTEENTH AMENDMENT to the UNITED STATES CONSTITUTION

39.

Plaintiff is a black male of Ethiopian national origin who was subjected to disparate treatment because of his race by Defendants.

40.

Plaintiff reallages paragraphs 9 through 15, above, as if set out verbatim herein.

41.

The discipline of Plaintiff by Defendants described in paragraphs 9 through 15, above, was because of his race, black because his alleged performance deficiencies were no more severe than and equally as trivial as those of his white coworkers who were not disciplined.

42.

By their discipline of Plaintiff because of his race, Defendants willfully violated 42 U.S.C. sec. 2000e et seq., 42 U.S.C. sec. 1981, and the Thirteenth Amendment to the United States Constitution.

### COUNT THREE

### NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF TITLE VII

43.

Plaintiff is a black male of Ethiopian national origin who was subjected to disparate treatment because of his national origin by Defendants.

44.

Plaintiff reallages paragraphs 16 through 34, above, as if set out verbatim herein.

13

45.

The disparate treatment of Plaintiff by Defendants described in paragraphs 16 through 34, above, was because of his national origin, Ethiopian.

46.

Plaintiff was terminated after having been wrongfully accused of violating Defendants' policies while other employees of non-Ethiopian national origin who actually did violate the same policies were not terminated.

47.

By their termination of Plaintiff because of his national origin, Defendants willfully violated Title VII.

**COUNT FOUR**
**RETALIATION IN VIOLATION OF TITLE VII**

48.

Plaintiff is a black male of Ethiopian national origin who was terminated in retaliation for objecting to the assignment of Mr. Guardiola and Ms. Sims to investigate the alleged false statement he had made concerning Mr. Lebar.

14

49.

Plaintiff realleges paragraphs 9 through 34, above, as if set out verbatim herein.

50.

Plaintiff was terminated after an investigation by Mr. Guardiola and Ms. Sims in retaliation for objecting to their assignment to investigate the alleged false statement he had made concerning Mr. Lebar, an objection Plaintiff made because of the discrimination on account of his race that he had earlier been subjected to by the same managers.

51.

Plaintiff was terminated after an investigation by Mr. Guardiola and Ms. Sims in retaliation for objecting to their assignment to investigate the alleged false statement he had made concerning Mr. Lebar, an objection Plaintiff made because of the earlier treatment to which he had subjected by them following his contact with Defendants' corporate office.

52.

Plaintiff was denied access to Defendants' peer review process by Betty Sims in retaliation for objecting to her assignment to investigate his

claim that he had been verbally abused by Mr. Lebar and for objecting concerning her role in his termination.

53.

By their retaliatory discharge of Plaintiff, Defendants willfully violated Title VII.

JURY DEMAND

54.

Plaintiff requests and demands a trial by jury on all issues properly submissible to a jury.

WHEREFORE, Plaintiff demands judgment against Defendant:

1.     requiring Defendants to reinstate Plaintiff to a position of equal duties and responsibilities as Plaintiff would have held but for the discriminatory conduct of Defendants; and

2.     preliminarily and permanently restraining Defendants from engaging in the aforementioned conduct; and

3.     awarding Plaintiff back pay, prejudgment interest, and damages for all employment benefits he would have received but for the discriminatory acts and practices of Defendants; and

4.     awarding Plaintiff compensatory and punitive damages; and

5.     awarding Plaintiff reasonable attorneys' fees and costs incurred in this action; and

6.     ordering any other relief this Court deems to be just and appropriate.

16

Respectfully submitted,

Russell G. Burnett
Georgia Bar No. 096205
881 Ponce de Leon Avenue, N.E.
Atlanta, GA  30306
Telephone: (404) 872-4252
Facsimile: (404) 378-6673
russellgburnett@gmail.com

17